Luz María Ortiz Rodríguez et al., Plaintiffs and Appellees, *v.* Puerto Rico Water Resources Authority, Defendant and Appellant.

No. R-63-262. Decided May 19, 1967.

*José Antonio Arabía* and *Carlos Santos Correa* for appellant. *Héctor Lugo Bougal, C. J. Irizarry Yunqué,* and *Donald R. Dexter* for appellees.

First Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Blanco Lugo, Mr. Justice Rigau, and Mr. Justice Ramírez Bages.

Mr. Justice Blanco Lugo delivered the opinion of the court.

We are concerned here with several claims against the Puerto Rico Water Resources Authority as a result of an accident which occurred on February 28, 1959 in Colonia

Florida, in the municipality of Santa Isabel, when a wire conducting electric power was detached and the workers Severo Flores Santiago, and José Guzmán Ortiz, came in contact with it, the former being electrocuted and the latter injured. In the complaint filed by the Manager of the State Insurance Fund, in subrogation to the amount paid to Feliciana Flores Alicea, it was alleged that defendant's negligence consisted in "not maintaining said electric lines [of high tension] at a safe height since they were detached and making contact with the ground . . . and without said lines being duly insulated." In the other two complaints filed by the concubine and relatives of the deceased, and by the injured party, negligence was attributed to the failure in maintaining the lines "in good condition and sufficiently secured and fixed to the poles to prevent detachments . . . moreover, in not exercising due diligence to interrupt the current and to restore promptly the detached wire, despite the fact of having been requested to do so by the foreman of Colonia Florida, which request was made through defendant's employee in charge of the power service in said place."

Defendant's position has been that the lines were installed and maintained following the security standards for this kind of installation; that as soon as it had knowledge of the damage its employees disconnected the flow of electric current through the cables and proceeded to repair it; that due to the manner in which the services are rendered throughout the rural zone of Puerto Rico, at the time the cable broke it had no control of the lines; and finally, that the detachment of the wire which caused the accident was due to an extraneous cause, to wit, that the pole supporting it and its guy wires were subjected to strong and rough movements upon attempting to release a cart loaded with cane which was stuck and entangled in the guy wires, producing a crevice between the pole and the ground in which it was driven, causing the breaking of a crossarm and

of some pins which supported the insulators in other parts of the line and that of the wire.

The trial court sustained the complaints. It concluded that defendant's negligence consisted in (a) failing to exercise the adequate supervision of the wire lines in the section where the detachment occurred and in failing to give attention to a complaint as to the existence of a defect in the pole from which the wire was detached,[1] and, (b) lack of supervision and repairs in the lines established by "the situation itself in which the lines were located, the condition of deterioration in the crossarms of the poles and in the wooden pins which supported the lines, which had been installed for more than twenty years."

Defendant-appellant's basic assignment of error centers on the manner in which the accident occurred and its cause. In support of their respective positions the parties offered elaborate oral evidence, as well as, in our opinion, more controlling and eloquent, ample documentary evidence consisting of photographs and diagrams, expert testimony,

---

[1] This conclusion of law is based on the following finding of fact:

"4.—On the night of February 26, 1959, that is, two nights before the date on which the accident occurred, while Rafael Famanía Ortiz, employee of Luce & Company, who lived in a house near said place and which was served by the lines of the secondary circuit which started from the transformer in pole 309-15, was watching television at about eight o'clock in the evening, he heard an explosion coming from said pole, and the lights in his house went off. He noticed that from the lines near said pole 'a greenish flare' came out according to his own description. He notified that fact next day to his chief, Mr. Pablo Torres Barranco, and at the suggestion of the latter, he went to the offices of the Water Resources Authority in the town of Santa Isabel, where he informed the occurrence to an employee of said Authority named Salvador Serrano. Despite the fact that he notified the said Mr. Serrano at seven o'clock in the morning of February 27, the damage was not repaired nor was Mr. Famanía Ortiz given light in his house again until after the death of Severo Flores. Said damage had also affected the residence of Jesús González, neighbor of that same place, as well as a motor for a water pump, because the supply of electricity of the secondary circuit had been interrupted and it continued like that during all of February 27, day and night, and until after the accident."

and the result of an experiment carried out before the court in order to connect it with defendant's Exhibit T which consisted of a piece of wire which remained attached to the insulator on the pole after the detachment. We have read and reread the transcript of evidence. We have examined carefully the photographs confronting them with the testimonies and explanations of the witnesses. We have weighed the expert testimony and considered the material evidence presented. Irrespective of the fact that in relation to the weighing of the documentary and expert evidence we are in the same position as the trial court, *Commonwealth* v. *Fonalledas*, 84 P.R.R. 552, 573 (1962), we cannot agree that the findings of fact of the trial judge constitute the most rational, fair, and juridical balance of the entire evidence, *Sanabria* v. *Heirs of González*, 82 P.R.R. 851 (1961). Furthermore, we believe, as suggested by appellant, that the trial judge did not consider nor weigh the evidence introduced by defendant, a fact established by his refusal to make additional findings of fact as he was requested to do, despite the fact that they were justified by the uncontroverted evidence which had been received.

Before summarizing the most pertinent aspects of the evidence we shall attempt to make a brief description of the place where the accident occurred, in the neighborhood of cane plantation No. 442. This plantation is separated from No. 440 by a path going from north to south, at the end of which it is intersected by a wider path, the intersection forming a T. The path from north to south, the narrower one, is the vertical line of the T; the other principal path is the horizontal line. To the west of the narrow path there is plantation 442. Along that path, on the border of plantation 442, there is a line of wooden poles, with wooden crossarms supported by three parallel wires. Each wire is fastened to the crossarm by a glass insulator in the form of a cup, which in turn is attached to the crossarm

by a wooden pin or plug. The poles have consecutive numeration beginning with number 309. In pole 309-15, at the height of the third crossarm (defendant's Exhibit S), there is a transformer to convert the voltage from 4,000 to 110 volts. Starting from that pole the lines change direction and continue to the west along the northern edge of the main path. This pole is held to the ground by two cables or guys. The pole measures about 30 feet and is driven in the ground about 5 feet. The first crossarm, where the breakage occurred, is at 29½ feet and the guys part from a height of 27 feet and cross diagonally, one the narrow path—east guy—and the other the main path—south guy. The east guy is anchored at a distance of 32½ feet inside plantation No. 440.

We shall make below a brief summary of the parties' evidence on the manner the accident occurred, without attempting to make reference but to the prominent features only. Defendant's evidence on the manner in which the breakage of the wire occurred began with the testimony of *Victor Santiago*, a youth 14 years old, who was gathering cane stalks with a friend near plantation 442. He testified that he saw two cane-hauling machines, one empty and the other loaded, which came in opposite directions, and which, upon meeting, were not able to go on because the path was too narrow, that the loaded cart swerved to the edge, the last wagon falling to the ditch; that the two machines, using a chain, attempted to pull up this wagon; and in doing so, the wagon got entangled with one of the guys of pole 309-15; that the pull was so strong that it caused the detachment of some "bobbins" from the pole, that every time the machines pulled the wagon, the pole moved; that he notified a foreman called Pablo [he refers to Pablo Torres Barranco] and then went to a coconut grove from where he noticed that one of the cables of the pole was broken.

*William Quiñones*, an engineer who works with defendant, testified that he went to the scene of the accident to carry out an investigation, that he noticed a hole or ditch at the base of the pole making evident it had been moved recently and that the guy wires had become loose and one of them was almost out of the place where it was anchored; that he also saw tire treads on the edge of the path. He took several photos at once of these particulars which he identified. He also found the insulator with the piece of wire which had remained attached to the pole when the breakage occurred; that the wire showed the peculiar characteristics of a wire which has been broken as a result of having been subjected to tension, that is, that the extreme shows a conic form. He carried out an experiment in the presence of the court submitting a wire of the same kind and width to tension and which shows the same conic form. He explained some sketches prepared on the basis of measurements taken by him to show that the two machines could not pass upon meeting. He indicated that the complaint which was received from Rafael Famanía referred to a lightning arrester on the pole of the Buscio pump situated at about 1,000 feet from pole 309-15.

*Luis Alfredo Pérez Flores*, detective who participated in the investigation, said that he saw the hole at the base of the pole and the guy wires "loose", "as if they had suffered a pull." *Sergeant William Correa Torres* testified in a similar sense and he said, further, that the pole was inclined.

*Evangelo Negrón* is the machinist who was operating the "garza" machine with the three wagons loaded with cane. He testified that upon coming near pole 309-15 he met another machinist called Gilberto Santiago who came in the opposite direction; that upon reaching the curve, at the intersection of the paths, both turned toward the right to make way, and the last wagon went into the ditch, getting entangled with a guy wire of the pole; that they pulled the

wagon with both machines, and when doing so, the wire moved, and the pole too; that at last he succeeded in pulling out the wagon and continued on his way.

It is interesting that Pablo Torres Barranco, one of plaintiffs' principal witnesses, places Gilberto Santiago, the operator of the machine with empty wagons, at the scene of the accident, who advised him "to be careful lest the wire would fall upon him." This necessarily presumes that the wire did not break suddenly and unexpectedly, but also that something had occurred which justified the expectation that the wire would break and could fall upon the persons who were near the place.

Plaintiffs' version seeks to establish that the lines were in bad condition and that the Authority did not exercise the adequate supervision nor did it pay attention timely to the warnings given on the condition of the lines. To that effect they introduced the testimony of *Rafael Famania Ortiz*, who lives in the neighborhood of the scene of the accident. He testified that two nights before the accident he heard an explosion on pole 309-15; that he reported the fact to the local office of the Authority through Pablo Torres Barranco; that he was without lighting service until after the accident occurred. *Pablo Torres Barranco* testified that after the wire fell, he went to the town to report the accident and that defendant's employee took about 15 minutes to look for gloves, pliers, etc. before going out to the scene of the damage. It was also established that the poles had been installed for about 22 years. Likewise the witnesses stated that prior to the accident the guys appeared to be "loose."

Against that evidence the Authority introduced the testimony of its employee, *Victor M. Martínez*, foreman of a crew of watchmen, who testified that 35 days previously he had worked on the inspection of the lines in Colonia Mercado, and that as part of that work, some pins were

changed and the lines between poles 309-15 to 309-17 were retightened; that on February 27 he was informed that there was a broken lightning arrester in the Buscio pump, which is located near the scene of the accident. A daily report of the work done was offered in evidence to corroborate this testimony. *William Quiñones* testified that the useful life of the poles and the crossarms is about 30 to 40 years.

The expert evidence consisted of the testimony of engineers Rafael R. Ramírez and Luis E. Fiol. *Ramírez* testified at great length on the possible causes of the breakage of a wire indicating the following: (1) the stretching of the wire on the elasticity tolerance which causes its thinness and eventually the rupture, its distinctive characteristic being that the end of the wire presents a conic form; (2) the movement may produce a short circuit and when contact between two wires takes place excessive current flows which melts part of the material and causes a weakness which does not permit a normal resistance, its essential characteristic being the presence of bubbles in the area of the breakage; (3) the existence of a "goose" in the wire due to carelessness in the installation; (4) the vibration produced by fatigue of the metal. Confronted with the facts of the case, and particularly with the piece of wire which remained attached to the insulator—the breakage occurred at about 18 inches from the pole on a line of about 283 feet—he concluded that the only attributable cause was application of excessive tension as corroborated by the conic form of the extreme of the wire and excluded the possibility of a short circuit precisely because of the place where the breakage occurred and the absence of bubbles. He said that there is no evidence of contact with another wire and explained that the rupture may not occur simultaneously with the application of tension. He affirmed that the result of the experiment carried out and the characteristics shown by Exhibit T are similar, if not identical.

Expert *Fiol*, presented by plaintiffs, testified that he had examined Exhibit T and had found evidence of the occurrence of an electric arc which might have been produced by a short circuit. He relied on the fact that the surface of the wire is not completely smooth, but that in some places it is "rough." He said further that a spark produces an area of weakness as a result of the high temperature which is generated. He attributed the breakage of the wire to some defect on the basis that it occurred with a force of about 1,000 pounds, that is, the same which caused the breakage of the pin. On cross-examination he accepted that the short circuit must have been produced by the contact of the broken wire with another wire, and he stated that "a wire which breaks cannot produce a short circuit," although it may produce an electric arc. Then he explained that "there is the possibility that this may have been produced at the time the arc was produced, but I do not believe that it can be produced also when the wire is detached because it is stretched and upon being detached it has to be detached by inches first and then by feet, and at three or four inches from the arc it cannot be supported." In the redirect he apparently abandons the reference to the electric arc and again affirms that "there was a short circuit from some other wire sometime."

 There is no ground in the evidence to attribute negligence to defendant's employees for not having acted with diligence in not interrupting the flow of the electric current once they were notified of the occurrence of the breakage in the transmission line. Even though credit could be given to this part of Pablo Torres Barranco's testimony to the effect that the person he addressed in the offices of the Authority in Santa Isabel delayed about fifteen minutes looking for gloves, pliers, and other instruments necessary to carry out the work he was expected to do—Torres was confronted on cross-examination with a statement he gave

to an investigator in which he did not offer this detail but affirmed that the employee went immediately to the scene of the accident—the truth is that irrespective of the rapidity of his action, he would not have been able to prevent the unfortunate outcome. The evidence establishes that as soon as the falling of the wire to the ground occurred a fire was produced in the proximate cane plantation and that, attracted by the fire and the smoke, the victim and the injured party ran towards the place. We know that absolute liability concerning the repairs of damages cannot be required of enterprises such as defendant, *Ramos* v. *Water Resources Authority*, 86 P.R.R. 572 (1962) and that a reasonable term to take the steps and carry out works seeking to avoid damages to third persons is tolerable. This is another manifestation of the known doctrine of foreseeability.

The theories of the parties having been confronted, relating them to the documentary, material, and expert evidence, the explanation offered by defendant seems more probable. That of plaintiffs practically relies on the physical fact of the breakage of the wire and the intimation that something had occurred two days before which initiated or hastened a process of weakening of the lines. That of defendant is corroborated by the photographs which show that the pole was moved by applying to it such a degree of force that it moved leaving a considerable crevice at its base. On the other hand, compared to the expert testimony of engineer Ramírez, that of engineer Fiol merely makes a series of inaccurate and vague speculations. If, in effect, a short circuit occurred it would not have been difficult to establish such fact making reference to the wires which came in contact. But the fact is that the adjoining wires— the two parallel lines of both extremes—were not ruptured or broken. Even Fiol himself in his answers admits that

the center wire was subjected to tension since he refers to the tension which caused the detachment of the pin. In this respect we must recall that the only evidence of tension was offered by defendant, attached to its version of the pulls received by the pole while trying to release the wagon. Under all the circumstances the calm and thoughtful analysis of the lengthy record leads us invariably to hold that no liability was established on the part of defendant and that the latter's theory is more consistent with the physical facts shown by the evidence.

The judgment rendered by the Superior Court, Ponce Part, on July 31, 1963 will be reversed and the complaints dismissed.